**Wendell A. MARTIN, et al.**

**v.**

**Charles C. FOTI, Jr., et al.**

**Civ. A. No. 81-2759.**

United States District Court, E.D. Louisiana.

March 31, 1983.

---

**2.** The Supreme Court expressed four factors which are relevant to the determination of Congressional intent: (1) Is the plaintiff one of the class for whose *especial* benefit the statute was enacted? (2) Is there any indication of legislative intent either to create such a remedy or to deny one? (3) Is it consistent with the underlying purposes of the legislative scheme to imply such a remedy? and (4) Is the cause of action one traditionally relegated to state law? 422 U.S. at 78, 95 S.Ct. at 2087.

**3.** In *Middlesex City Sewerage Authority v. Sea Clammers Association,* 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981), the Supreme Court again made clear that the key inquiry in determining whether a federal statute grants a private right of action where none is expressly given is the intent of Congress. *Id.* at 13, 101 S.Ct. at 2622.

Wendell Martin and Lester Duplessis, pro se.

Freeman R. Matthews, New Orleans, La., for defendants.

CHARLES SCHWARTZ, Jr., District Judge.

This matter was tried before the Court, sitting without a jury, on February 3, 1983. At the close of trial, the Court left the case open for the purpose of allowing defendants time to locate and submit in evidence the three disciplinary reports referred to at trial, and which defendants had been ordered to produce at trial by minute entry dated March 25, 1982. Those reports having now been produced, the Court, after review of the record in this matter, the evidence presented, and the applicable law, rules as follows.

To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such, and to the extent that any of the conclusions of law constitute findings of fact, they are so adopted.

## FINDINGS OF FACT

Plaintiff Wendell Martin is and was at all times mentioned herein, a prisoner in the custody of the Orleans Parish Prison.

Plaintiff Lester Duplessis is and was at all times mentioned herein, a prisoner in the custody of the Orleans Parish Prison.

Defendant Charles C. Foti, Jr., is and was at all times mentioned herein, the Criminal Sheriff of Orleans Parish, in charge of the Orleans Parish Prison.

Defendants Belisle, Bordelon, Barrere, and Cook were at all times mentioned herein, members of the Orleans Parish Criminal Sheriff's office.

Defendant Larkin was at all times mentioned herein, a deputy sheriff assigned to the Orleans Parish Prison.

At or about 6:45 A.M. on May 27, 1981, while calling roll on tier B–1 of the Orleans Parish Prison, Deputy Larkins marked plaintiff Martin's name and subsequently

wrote a disciplinary report on Martin for wearing a skull cap at roll call, in violation of the prison regulation forbidding head coverings and plaited hair between the hours of 6 A.M. and 8 P.M. (Rules 826 and 827 of the Orleans Parish Prison Rules and Regulations). Thereafter, while being called for outdoor recreation, Martin observed in plain view a disciplinary report with his name on it, at which time Martin asked Deputy Larkins what the report was for and if he could be given a copy. Larkins informed Martin that the report was for having a headscarf on during roll-call but refused to give Martin a copy.

On June 1, 1981, Martin was summoned to a disciplinary court consisting of Orleans Parish Prison officers Barrere, Hill, and Stewart. At that time, Barrere read the report to Martin, who admitted having a skull cap on, but no plaits, and responded that he had just woken up and had not had time to take the cap off. The disciplinary court then entered a "Not Guilty" disposition, closed the case, and ordered Martin returned to his tier, but warned him not to appear before the court again.

At or about 6:45 P.M. on June 6, 1981, while waiting for the left-side doors to be open on Tier B–1 in order to call roll, Martin engaged Larkins in some conversation, the subject of which is in dispute, but which apparently led Larkins to mark Martin's name when Martin responded to the roll-call.

Larkins subsequently brought Martin to the Watch Commander, whereupon Larkins reported that Martin had been interfering with roll-call. After some questioning of Martin, the Watch Commander recommended that Larkins write up a disciplinary report. When Larkins then was returning Martin to his tier, Martin requested that he receive a copy of that disciplinary report upon its completion, which Larkins refused.

On June 8, 1981, Martin was summoned to a disciplinary court consisting of officers Hill and Barrere. At that time, Barrere read aloud Larkins' report, which accused Martin of interfering with roll call despite repeated orders to remain silent. Martin

was given the opportunity to explain his actions, and was then sentenced by the court to 30 days in administrative detention on tier C–1, which sentence began immediately.

The administrative detention area on tier C–1 is described in the Orleans Parish Prison Rules and Regulations as "a holding area, preferably a re-adjustment area were [sic] prisoners who present a immediate threat to the security of the facility through specific act of planned or committed misbehavior of rules and regulations of the institution."

The C–1 area was described by the prisoners as a filthy, rat and roach infested area, where food trays and laundry are left for days and no fans or watercoolers exist, and an ultra-bright electrical fixture remains on all the time, causing sweltering temperatures. Prison officials denied conditions are that bad.

On June 8, 1981, at or about 5:00 P.M., plaintiff Duplessis was placed in the C–1 area pending an investigation of an alleged rape that occurred the previous night. At or about 11:45 P.M. on June 14, 1981, while still on Tier C–1, Duplessis was written up by Larkins for returning soap and shampoo to another prisoner, Robert Miller, after taking a shower, instead of returning directly to the cell.

Another deputy had let Duplessis and the others out to shower and allowed Duplessis to borrow the soap and shampoo from Miller. In fact, Duplessis and Miller had been sharing the shower articles since June 8, when they were placed on C–1.

According to plaintiffs Martin and Duplessis, who were sharing a cell on C–1 at the time, Larkins had come by earlier in the day on June 14, 1981 and attempted to engage Martin in conversation, at which point Duplessis told Martin "not to fall into that trap." After Duplessis' shower and return to his cell, plaintiffs contend that Larkins requested to see Duplessis' name tag, and when asked for what reason, replied "you fell into that trap." At that point, Duplessis requested a copy of any disciplinary report, which was refused.

On June 16, 1981, Duplessis was summoned to a disciplinary court consisting of officers Bordelon, Cook, and Noble. At that time, Cook read Larkins' disciplinary report aloud, which accused Duplessis of failure to obey an order of a staff member by not returning directly to his cell after the shower. Duplessis was given the opportunity to explain his actions, and was then sentenced by the court to 30 days in administrative detention on tier C–1, with no credit for the eight days already spent there pending the rape investigation.

No charges were ever brought against Duplessis arising out of the rape investigation. In fact, despite repeated requests by Duplessis to speak with the officers investigating the rape, or other officials, no prison official spoke with Duplessis about the incident after the morning of June 8, 1981, when he was placed on tier C–1. In the conversation that morning, Duplessis was questioned about the rape and informed an investigation was pending. Warden Wilfred Washington, who was Associate Warden at the relevant times herein, testified that it was regular prison procedure to place witnesses or suspects in tier C–1 for security and administrative reasons pending investigations of serious prison misbehavior or criminal activity.

In both Martin's June 8 and Duplessis' June 16 disciplinary court hearings, according to the plaintiffs, neither was permitted to call any witnesses, although they would like to have done so. There is no evidence that either formally requested witnesses, but it is clear no witnesses were called.

The Orleans Parish Prison Rules and Regulations,[1] a copy of which is handed to every prisoner upon arrival, state the disciplinary procedures to be followed in the prison, some pertinent ones in this matter being as follows:

(a) The disciplinary board shall consist of at least three members of the Orleans Parish Criminal Sheriff's Office;

(b) An inmate shall be brought before the board within twenty-four hours of the actual incident unless extenuating circumstances exist;

(c) After the inmate is brought before the board, the warden will read aloud the content of the incident report and the accusation involved;

(d) The accused will be allowed to present witnesses who may appear on his behalf;

(e) The accused will then be allowed to make any statement relative to the incident before the board.

Further, the prison regulations provide that any inmate found responsible for violating any regulations may be subject to the following disciplinary procedures, at the discretion of the disciplinary board: (1) extended lock-down; (2) administrative detention for a maximum of 30 days for any one violation; (3) disciplinary segregation, loss of visiting privileges; (4) withholding of good time; (5) removal from work details or programs; (6) extra work details; (7) reprimand, probation or warning; (8) criminal charge; (9) no action.

In addition, the regulations state that the disciplinary board is vested with a wide range of latitude and discretion, and specifically that for a prisoner who has "violated many rules and regulations of the parish prison system, a disciplinary record will be forwarded to Baton Rouge record room requesting withholding of your good time."

Warden Gary Bordelon testified that he drafted the regulations and that they were in effect at the time of the incidents which are the subject of this suit.

Warden Wilfred Washington testified that despite the stated regulations, prisoners have not been given the opportunity to present witnesses at disciplinary board hearings, except in "severe" cases.

Warden Washington also testified that it is the recognized practice of the prison to orally inform prisoners of the reason(s) for which they are being brought before the board, prior to the hearing, but that written reasons or copies of the disciplinary reports

1. A complete copy is attached as Appendix A.

are never given. Furthermore, Deputy Larkins testified that he did not believe that there was an obligation on his part to tell a prisoner why he was writing him up for a disciplinary infraction.

## CONCLUSIONS OF LAW

Plaintiffs have instituted this suit for damages and injunctive relief pursuant to Title 42, United States Code, Section 1983, to redress the deprivation under color of state law of rights secured by the United States Constitution. Plaintiffs have also requested relief in the form of a declaratory judgment pursuant to Title 28, United States Code, Section 2201. This Court has jurisdiction pursuant to Title 28, United States Code, Sections 1343 and 2201, and venue is proper in the Eastern District of Louisiana.

Plaintiffs seek monetary, equitable, and declaratory relief for the denials of due process [2] allegedly accorded them by (1) being denied copies of the disciplinary reports or notification of the charges against them, and thereby being prevented from preparing a defense for the subsequent disciplinary hearings; (2) being denied the opportunity to call witnesses in their defense at the disciplinary hearings; (3) the holding of plaintiff Duplessis in segregation, without a disciplinary report or hearing for eight days; and (4) for being subjected to cruel and unusual punishment by being placed in the allegedly unsanitary, unlivable conditions of tier C–1.

█ The Eighth Amendment claim, (4) here, may be dismissed summarily. Although the conditions of tier C–1 are clearly not pleasant, the plaintiffs have failed to show by a preponderance of the evidence that the conditions there are cruel and unusual in a prison context, i.e., "incompatible with the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976).

**2.** Plaintiffs also allege violations of the Sixth Amendment and the Equal Protection Clause, but the Court finds it unnecessary to reach

The Due Process claims are a different matter altogether, and must be approached in a two-step fashion.

First, the trier of fact must determine if the plaintiffs have a "liberty" interest which will trigger the protection of the Fourteenth Amendment. If the answer to this inquiry is affirmative, it is then necessary to decide the specific procedures that are required to afford that interest adequate protection. *Hewitt v. Helms,* —— U.S. ——, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983); *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); *O'Callaghan v. Anderson,* 514 F.Supp. 765, 767–68 (M.D. Pa.1981).

Turning to the first inquiry, the United States Supreme Court has just recently reaffirmed the principle that "[l]iberty interests protected by the Fourteenth Amendment may arise from two sources—the Due Process Clause itself and the laws of the States." *Hewitt, supra,* —— U.S. at ——, 103 S.Ct. at 868.

█ In the prison context, it is well-settled that as long as the confinement of the prisoner is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause itself does not create a liberty interest in being subject to certain treatment by prison authorities. *Hewitt, supra,* at —— – ——, 103 S.Ct. at 868–70; *Montayne v. Haymes,* 427 U.S. 236, 242, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976). Prison officials are accorded "broad administrative and discretionary authority over the institutions they manage," *Hewitt, supra,* —— U.S. at ——, 103 S.Ct. at 868, and "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 548, 99 S.Ct. 1861, 1879, 60 L.Ed.2d 447 (1979). Lawful incarceration, then,

these allegations, in light of the conclusions below.

"brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price v. Johnston,* 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948).

Thus, the Supreme Court has held that there is no "constitutional or inherent right" to parole, *Greenholtz v. Nebraska Penal Inmates,* 442 U.S. 1, 7, 99 S.Ct. 2100, 2103, 60 L.Ed.2d 668 (1979), and "the Constitution itself does not guarantee good-time credit for satisfactory behavior while in prison," *Wolff, supra,* 418 U.S. at 557, 94 S.Ct. at 2975. *See also Meachum v. Fano,* 427 U.S. 215, 225, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976); *Moody v. Daggett,* 429 U.S. 78, 88, n. 9, 97 S.Ct. 274, 279, n. 9, 50 L.Ed.2d 236 (1976).

In this case, then, plaintiffs cannot be held to have a "liberty" interest inherent in the Due Process Clause, entitling them to certain procedures in prison disciplinary determinations.

Despite this, the Supreme Court has repeatedly held that a State may create liberty interests protected by the Due Process Clause through statutes or regulations which create justifiable expectations that liberty will not be curtailed absent certain conditions. Thus, in *Wolff,* where the Court rejected any notion of a right to good-time credits inherent in the Constitution, the Court found that the State of Nebraska had created a right to such credits. 418 U.S. at 556–57, 94 S.Ct. at 2974–75. *See also Greenholtz, supra,* (parole); *Vitek v. Jones,* 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980) (transfer to mental institution); *Wright v. Enomoto,* 434 U.S. 1052, 98 S.Ct. 1223, 55 L.Ed.2d 756 (1978), and *Hewitt, supra* (administrative segregation).

In this case, as in *Wolff,* the state has specifically created a right to good-time. R.S. 15:571.3. Moreover, the good-time statute specifically provides: "The sheriff of the parish in which the conviction was had shall have the sole authority to determine when good time has been earned for purposes of diminution of sentence." R.S.

15:571.3(A). Also, as in *Greenholtz,* the state has specifically created a right to parole, R.S. 15:574, which statute provides that the parole board "shall consider all pertinent information with respect to each prisoner eligible for parole, including ... his prison records...." R.S. 15:574.4(C).

The Court takes judicial notice from the criminal records of plaintiffs[3] that Duplessis is eligible for good-time, but Martin is not, as he was convicted on August 23, 1978 as an habitual offender. R.S. 15:571.3(C). Also, the Court takes judicial notice that Martin is eligible for parole, but Duplessis is not, though his conviction is under appeal, as he has been convicted of armed robbery. R.S. 15:574.4(B).

In this case, plaintiffs' rights to good-time or parole were clearly affected by the procedures followed in the Orleans Parish Prison. As stated in their own rules and regulations, and as permitted by the good-time statute of the state of Louisiana, Duplessis could have actually lost good-time as punishment for the disciplinary charges brought. Moreover, even though not deprived of good-time for these charges, an increased prison disciplinary record could well cause a loss of good-time in the future. Finally, the accumulation of an increased prison disciplinary record could well hurt at least plaintiff Martin's chances for parole. Thus, even though in the instant case plaintiffs suffered only administrative detention, the process they question, and the statutes and regulations on which they rely, encompass a liberty interest in being released from prison altogether.

■ Therefore, the Court concludes that the Louisiana statutes on good-time and parole, the Orleans Parish Prison Rules and Regulations, and the standard disciplinary procedures followed in conjunction therewith, have created a liberty interest which the plaintiffs are entitled to rely upon and which this Court, pursuant to the Due Process Clause of the Fourteenth Amendment, is bound to protect. Despite the wide latitude to be accorded state prison officials, "a

**3.** Defendants supplied these records following trial, at the Court's request.

policy of judicial restraint cannot encompass any failure to take cognizance of valid constitutional claims whether arising in a federal or state institution. When a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights." *Procunier v. Martinez,* 416 U.S. 396, 406, 94 S.Ct. 1800, 1808, 40 L.Ed.2d 224 (1974).

Having thus decided the first of our two-step inquiry, namely, that plaintiffs have a sufficient liberty interest at stake, the Court must now turn to the question of what procedures are required, or what process is due, to afford adequate protection of this liberty interest.

■ The procedures required by the Due Process Clause depend upon the particular context involved. In *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), the Supreme Court stated that the factors to be weighed in determining the process due are as follows:

> ... First, the private interest that will be affected by the official action; second the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

In prison due process cases, the Supreme Court has found different procedural requirements depending upon the liberty interests involved. In *Wolff,* the Court set forth the minimum process due where inmates face the possibility of losing good-time credits. In *Hewitt,* the Court found a different set of procedures due where inmates face only administrative segregation pending a prison board hearing.

In this case, then, plaintiff Duplessis' claim with regard to being held on tier C–1 without a hearing must be separated from plaintiffs' claims with regard to the procedures followed pursuant to the hearings themselves.

In *Hewitt,* —— U.S. at ——, 103 S.Ct. at 874, the Supreme Court concluded that in the particular context of the decision to confine an inmate to administrative segregation pending completion of an investigation into misconduct charges against him, the following procedures must be followed:

> An inmate must merely receive some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation. Ordinarily a written statement by the inmate will accomplish this purpose, although prison administrators may find it more useful to permit oral presentations in cases where they believe a written statement would be ineffective. So long as this occurs, and the decision-maker reviews the charges and then-available evidence against the prisoner, the Due Process Clause is satisfied.

The Court also added, at ——, n. 8, 103 S.Ct. at 874, n. 8, that "the proceeding must occur within a reasonable time following an inmate's transfer," and found in the case at hand that five days was a reasonable time. *Id.* at ——, 103 S.Ct. at 874. Further, the Court noted that their decision does not give blanket permission to keep inmates for indefinite periods in administrative segregation, but rather only while an investigation is ongoing. *Id.* at ——, n. 9, 103 S.Ct. at 874, n. 9.

■ In the instant case, then, the due process required in *Hewitt* must be applied to that portion of plaintiff's claim which concerns the holding of plaintiff Duplessis in segregation pending the outcome of the rape investigation. From the evidence adduced at trial, it is clear that Duplessis received "some notice" of the potential charges against him and "the opportunity to present his views" when questioned by the investigating officer the morning of June 8, 1981. Whether that investigating officer was "the prison official charged with deciding whether to transfer him to administrative segregation" is unclear from the evidence, as is whether "the decision-

maker" reviewed the charges and available evidence at any point. If the investigating officer was the decisionmaker, then there was no due process violation. If the investigating officer was not the decisionmaker, obviously he must have communicated with the decisionmaker prior to Duplessis being placed in administrative segregation. Whether Duplessis' views were ever communicated to the decisionmaker is a separate question, and one not answered by the evidence.

The Court cannot merely assume, however, that a prison official, in this case the investigating officer who questioned Duplessis about the rape, would fail to communicate relevant evidence and statements to the official in charge of deciding whether to place an inmate in administrative segregation, or that the official in charge would fail to ask what explanation a possible suspect offered. Whether the investigation was ongoing during the eight-day period Duplessis was confined to tier C–1 is also not answered by the evidence, but for the reasons just stated, the Court concludes that plaintiff Duplessis has failed by a preponderance of the evidence to show that his due process rights were violated by being held in administrative segregation pending the rape investigation.

This holding and the due process requirements of *Hewitt,* however, do not apply to plaintiffs' other due process claims. In the two instances in which the plaintiffs were sentenced to thirty days in administrative detention on tier C–1, a different set of procedural requirements must apply. In those instances the private interests at stake were considerably greater than those faced by Duplessis in being held in segregation pending an investigation; in those instances plaintiffs risked loss of good-time or parole. Indeed in *Hewitt* the Supreme Court distinguishes the two situations for due process purposes, stating:

> Unlike disciplinary confinement the stigma of wrongdoing or misconduct does not attach to administrative segregation under Pennsylvania's prison regulations. Finally, there is no indication that administrative segregation will have any significant effect on parole opportunities.

*Id.* at ——, 103 S.Ct. at 872.

■ Therefore, this Court concludes that the due process standards to which defendants should be held in prison disciplinary determinations should be those outlined by the Supreme Court in *Wolff v. McDonnell, supra,* 418 U.S. at 564–573, 94 S.Ct. at 2978–2983. In that case, the Supreme Court faced a due process challenge to the procedures used by the state of Nebraska for prison disciplinary determinations in which inmates faced loss of good-time credits and/or confinement in a disciplinary cell. As in *Hewitt,* the Supreme Court's decision in *Wolff* distinguishes between the due process required where these sanctions are possible and the due process required where inmates face only "the imposition of lesser penalties such as the loss of privileges." *Id.* at 572, n. 19, 94 S.Ct. at 2982, n. 19.

The procedures mandated by *Wolff* are as follows: (1) that written notice of the charges be given to the disciplinary-action defendant at least twenty-four hours in advance of his appearance before the prison disciplinary board; (2) that the inmate be allowed to call witnesses and present documentary evidence at the hearing where such would not be unduly hazardous to institutional safety or correctional goals; and (3) that the prison disciplinary board make a written statement as to the evidence relied on and the reasons for taking any disciplinary action. *Id.* at 564–68, 94 S.Ct. at 2978–80.

The Court in *Wolff* articulates at length the reasons for its decision to require these procedures and not others. The reasons given apply equally to the instant case, and this Court sees no purpose in re-hashing or re-wording the careful considerations of the Supreme Court in this opinion. Therefore, this Court, without more, will apply these due process standards to the instant case.

First, it is clear that both the regulations themselves and the practice followed in the incidents complained of here satisfy the third requirement of *Wolff* listed above.

As to the second requirement, although the regulations themselves state unconditionally that inmates will be allowed to present witnesses at disciplinary hearings, Warden Washington testified that this is allowed only in "severe" cases, and certainly no witnesses were presented in the incidents in question. Whether or not the plaintiffs requested to call witnesses in their behalf is not of great import, because they almost surely would not have been permitted to do so in any case. Thus, it is evident that the defendants herein have violated their own regulations consistently, and in the two incidents in question specifically. However, their regulations require more than is necessary under the Due Process Clause of the Fourteenth Amendment: the prison officials need not allow witnesses in every instance, nor need they explain their reasons for refusing to call witnesses in particular cases. *Id.* at 567–68, 94 S.Ct. at 2980–81.

■ Although it is disturbing that Orleans Parish Prison officials do not follow their own regulations,[4] the only basis of jurisdiction in the instant case is to redress constitutional violations. Therefore, this Court must conclude that defendants have not violated plaintiffs' due process rights under the Fourteenth Amendment by refusing to allow the presentation of witnesses.

■ As to the first requirement of *Wolff* set forth above, however, it is clear that defendants have violated plaintiffs' constitutional rights. The regulations themselves do not require any notice whatsoever to be given inmates of the charges for which they are brought before the disciplinary board, and the prison practice is clearly only to give oral notice, if that. In the specific instances in question, moreover, plaintiffs requested written notice of the charges by requesting copies of the disciplinary reports.

Therefore, the Court finds that the defendants did violate plaintiffs' constitutional rights under the Due Process Clause of the Fourteenth Amendment to receive written notification of the charges against them at least twenty-four hours prior to appearing before the disciplinary board.

In so holding, the Court does not pass on the issue of whether plaintiffs were guilty or innocent of the disciplinary charges against them. That is not an appropriate inquiry in a § 1983 suit, unless the actions of the prison board are "arbitrary and capricious or an abuse of discretion." *Smith v. Rabalais,* 659 F.2d 539, 545 (5th Cir.1981), *cert. denied,* 455 U.S. 992, 102 S.Ct. 1619, 71 L.Ed.2d 853. If this were a state proceeding, the Court would perhaps consider more thoroughly the board's decisions, particularly in light of the apparent revenge motivation of the prison guard Larkins, of which the board in each case may not have been aware. See *Smith,* id. at 546, n. 20. However, the Court cannot conclude from the record that the decisions of the board in this case violated the *Smith* standard.

■ The Court must now turn to the question of remedies. As regards damages, it is well-established that correctional officials are entitled to qualified immunity from damage claims brought under 42 U.S.C. § 1983, if they reasonably believe in good faith that their conduct is lawful, even though it was not. Such immunity is not available, however, where the constitutional right in question is clearly established and the offenders should have known their conduct was illegal. *Procunier v. Navarette,* 434 U.S. 555, 561–67, 98 S.Ct. 855, 859–62, 55 L.Ed.2d 24 (1978).

Damages have been awarded by at least one other court for the same violation found herein, namely, the failure to give written notice of charges in prison disciplinary hearings, where the possible sanctions include loss of good-time, solitary confinement, and the lessening of chances for parole and clemency, even though the sanctions imposed were not as severe. *Ware v. Heyne,* 575 F.2d 593 (7th Cir.1978).

---

4. It is also evident that defendants violated their own regulations in holding a hearing for plaintiff Martin with only two, instead of three, prison officials presiding.

■ Although in this case the defendants apparently did not believe their conduct was illegal, as evidenced by the fact that their regulations did not even include provisions for written notification and by the testimony of Deputy Larkins that he did not believe he had a duty to inform prisoners of the charges against them, they should have so known.

Defendants might argue that they reasonably believed the *Wolff* requirements did not apply to the disciplinary hearings in this case, based on a reading that *Wolff* involved the actual loss of good-time and not merely its potential loss. Even if such a reading were considered reasonable,[5] this argument is without merit in that defendants cannot have known twenty-four hours prior to the hearings whether the boards were going to recommend a loss of good-time, and hence cannot claim now that had good-time been at issue, advanced written notice would have been given. In fact, any such claim would be an admission that the hearings were merely a fraud and the decisions made *ex parte* which would also violate the *Wolff* standards. Moreover, any such argument would fly in the face of the uncontroverted testimony that the prison practice is never to give written notification.

■ Therefore, this Court shall assess damages against the defendant Foti, as the individual responsible for the operation of the Orleans Parish Prison, as follows:

(1) for plaintiff Martin, $10.00 per day that he was kept in administrative detention on tier C–1, thus amounting to a total of $300.00;

(2) for plaintiff Duplessis, $10.00 per day that he was kept in administrative detention on tier C–1, thus amounting to a total of $300.00.

Further, the Court shall hereby issue an injunction expunging from all prison records and files the two disciplinary reports/findings in question, namely the one for plaintiff Martin on June 8, 1981 and the one for plaintiff Duplessis on June 16, 1981.[6]

Finally, the Court shall hereby issue an immediate, permanent, and continuing injunction against defendant Foti and the Orleans Parish Prison, to the following effect: Henceforth, all inmates charged with prison violations for which they could possibly be deprived of good-time, or otherwise suffer because of their disciplinary record an increased possibility of same or of a lessening of their chances for parole, shall be given written notification of the charges against them at least twenty-four hours prior to appearing before the prison disciplinary board.[7]

The Clerk of Court is directed to enter a judgment in accordance with the foregoing.

### APPENDIX A

#### GUIDELINES

THE FOLLOWING GUIDELINES WERE ESTABLISHED TO AID INMATES TO CLEARLY UNDERSTAND THE RULES AND REGULATIONS OF THIS INSTITUTION.

THESE RULES AND REGULATIONS WILL REMAIN FIRM AND SHALL BE OBLIGED BY ALL INMATES.

IF ANY CHANGES OR MODIFICATIONS TO THESE RULES AND REGULATIONS ARE NECESSARY FOR THE OPERATION OF THIS INSTITUTION, THEY WILL BE SET FORTH BY THE CRIMINAL SHERIFF OR BY A SELECTED BOARD OF STAFF MEMBERS OF THE ORLEANS PARISH CRIMINAL SHERIFF'S OFFICE.

---

**5.** To the contrary, the injunction issued in *Wolff* clearly applies to all hearings where inmates are faced with a loss of good-time. Moreover, in *Ware,* the Seventh Circuit awarded damages to a plaintiff who also did not actually lose good-time, but only faced that possibility.

**6.** Although plaintiffs did not request this particular relief, it is well within the Court's equitable powers, and has been given in at least one prior case, e.g. *Ware, supra.*

**7.** As a result of this injunction, the Court sees no reason to issue a declaratory judgment as requested by plaintiffs.

### ORLEANS PARISH CRIMINAL SHERIFF'S OFFICE

### DISCIPLINARY REPORT

A Disciplinary Report covers the following information:

a. Incident Report number

b. Name of inmate(s)

c. Folder number

d. Institution: Name of the facility the inmate is incarcerated in.

e. Place assigned to: Tier or Quad, cell number and floor.

f. Name of person(s) reporting the incident, rank/title, date and time.

g. Location of alleged infraction(s).

h. Action taken: Whole type.

i. Person authorizing the action, date and time.

j. Witness (es) name(s).

k. Physical evidence—Discription and disposition.

l. Narrative of alleged infraction:

m. Inmate's remarks

n. Statement(s) of witness(es): Name of witness, folder number, tier/bldg.

o. Other facts concerning the charge.

p. Investigator's comments and conclusions. Investigator's name, rank, date and time the reported was investigated.

q. After all the information has been obtain, the warden will then conduct the hearing giving the date, location, naming the member(s) of the board attending, the disposition, the case status, and the aciton taken. The warden will then sign and date the report with one (1) copy going into the inmate's folder.

### DISCIPLINARY PROCEDURES

THE DISCIPLINARY BOARD IS AN IMPARTIAL TRIBUNAL CONSISTING OF AT LEAST THREE (3) MEMBERS OF THE ORLEANS PARISH CRIMINAL SHERIFF'S OFFICE. THOSE AUTHORIZED TO SIT IN ON THE BOARD ARE: CHIEFS, WARDENS, ASSOCIATE WARDENS, WATCH COMMANDERS, *RANK MEMBER FROM THE SECURITY DIVISION,* RANK MEMBER FROM THE SPECIAL INVESTIGATION DIVISION. THE BOARD WILL BE CHAIRED BY ONE OF THE ABOVE MENTIONED EMPLOYEES DURING THE DISCIPLINARY HEARING. *ANY MEMBER OF THE BOARD DIRECTLY INVOLVED IN ANY INVESTIGATION OR INCIDENT WITH AN INMATE* APPEARING BEFORE THE BOARD, WILL EXCUSE HIMSELF FROM THAT HEARING AND WILL BE REPLACED BY ANOTHER AUTHORIZED MEMBER.

*AN INCIDENT REPORT WILL BE COMPLETED WHEN AN INMATE IS ACCUSED OF VIOLATING ANY OF THE RULES AND REGULATIONS OF THE ORLEANS PARISH CRIMINAL SHERIFF'S OFFICE.* THE FOLLOWING PROCEDURES WILL BE USED TO CONDUCT DISCIPLINARY HEARINGS FOR ALL FACILITIES OF THE ORLEANS PARISH CRIMINAL SHERIFF'S OFFICE.

THE WARDEN ASSIGNED TO EITHER ORLEANS PARISH PRSIONM, LOCATED AT 531 SOUTH BROAD STREET, NEW ORLEANS, COMMUNITY CORRECTIONAL CENTER, LOCATED AT 2800 GRAVIER STREET, NEW ORLEANS, OR HOUSE OF DETENTION, LOCATED AT 2735 PERDIDO STREET, NEW ORLEANS, WILL CONDUCT REGULAR DISCIPLINARY HEARINGS AT THE FACILITY UNDER HIS CONTROL. HE WILL INSURE THAT ALL INMATES WHO ARE TO APPEAR BEFORE THE DISCIPLINARY BOARD, DO SO WITH THE INCIDENT REPORT OR THE RESULTS OF THE INVESTIGATION WHEN POSSIBLE, *WITHIN TWENTY-FOUR (24) HOURS OF THE ACTUAL INCIDENT UNLESS EXTENUATING CIRCUMSTANCES EXIST.*

INMATES MAY SUBMIT TO THE WARDEN, IN WRITING, A WAIVER INDICATING THAT THEY DO NOT WISH TO CONTEST THE FACTS OF THE INCIDENT REPORT OR THE RESULTS OF

ANY INVESTIGATION THAT MAY HAVE BEEN CONDUCTED. THE WARDEN WILL FORWARD WAIVERS TO THE DISCIPLINARY BOARD TO BE PROCESSED. THE BOARD WILL THEN EVALUATE THE COMPLAINT AS THOUGH THE INMATE WAS PRESENT, AND FOLLOW THE NORMAL OUTLINED PROCEDURES. THE INMATE WILL BE NOTIFIED OF THE RESULT OF THE HEARING AND WHAT COURSE OF ACTION, IF ANY, WILL BE TAKEN.

INMATES WHO ARE UNRULY OR HAVE A MENTAL OR PHYSICAL PROBLEM MAY, AT THE DISCRETION OF THE WARDEN, REMAIN ON THE TIER. THE HEARING WILL BE CONDUCTED AS THOUGH THE INMATE WAS PRESENT AND THE INMATE WILL BE INFORMED OF THE RESULT OF THE HEARING AND WHAT ACTION, IF ANY ACTION, WILL BE TAKEN. INMATES WHO CAUSE A DISTURBANCE OR BECOME UNRULY DURING THE HEARING MAY BE REMOVED FROM THE HEARING AND THE HEARING WILL CONTINUE AS THOUGH THE INMATE WAS PRESENT. THE INMATE WILL THEN BE NOTIFIED OF THE RESULTS OF THE HEARING AND WHAT ACTION, IF ANY ACTION, WILL BE TAKEN.

THE INCIENT REPORT WILL BE REVIEWED BY THE BOARD PRIOR TO THE MEETING WITH THE INMATE, SHOULD THE BOARD DETERMINE THAT A SPECIFIC INCIDENT WARRENTS AN INVESTIGATION, THE BOARD WILL REQUEST THE SPECIAL INVESTIGATION DIVISION TO CONDUCT AN INVESTIGATION AND FILE THEIR FINDINGS WITHIN FORTY–EIGHT (48) HOURS OF THE INCIDENT. THE BOARD SHALL HAVE THE ACCUSED INMATE'S FOLDER PRESENT AND REVIEW THE FILE PRIOR TO THE HEARING. *AFTER THE INMATE IS BROUGHT BEFORE THE BOARD, THE WARDEN WILL READ ALOUD BEFORE THE BOARD AND THE INMATE, THE CONTENT OF THE INCIDENT RE-PORT AND THE ACCUSATION INVOLVED. THE ACCUSED WILL BE ALLOWED TO PRESENT WITNESSES WHO MAY APPEAR ON HIS BEHALF.* THE ACCUSED INMATE WILL THEN BE ALLOWED TO MAKE ANY STATEMENT NECESSARY RELATIVE TO THE INCIDENT, BEFORE THE BOARD.

THE BOARD MAY THEN QUESTION THE INMATE AS TO EVIDENCE, STATEMENTS, OR POINTS OF CLARITY INVOLVING THE ALLEGATION OR ANY OTHER NECESSARY INFORMATION CONCERNING THE INCIENT INVOLVED. THE BOARD SHALL THEN MAKE A DECISION BASED ON THE OFFENSE, THE NUMBER OF TIMES THE OFFENSE HAS BEEN COMMITTED, CIRCUMSTANCES INVOLVED, *EVIDENCE OR PHYSICAL EVIDENCE PRESENTED,* AND STATEMENTS AND/OR REPORTS FROM ANY INVESTIGATION. THE INMATE WILL THEN BE ADVISED OF WHATEVER DISCIPLINARY ACTION, IF ANY, ORALLY IN THE PRESENCES OF THE BOARD. THE WARDEN WILL THEN RECORD THE CHARGE, DISPOSITION, AND THOSE PRESENT FOR THE HEARING ON THE BOTTOM OF THE INCIDENT REPORT.

BEFORE DISTRIBUTING, A COPY OF THE REPORT WILL BE FILED IN THE INMATE'S FOLDER. THE BOARD'S findings will be documented and maintained.

INMATES FOUND RESPONSIBLE FOR VIOLATING INMATE"S RULES AND REGULATIONS MAY BE SUBJECT TO THE FOLLOWING DISCIPLINARY PROCEDURES, AT THE DISCRETION OF THE DISCIPLINARY BOARD.

(1) REQUEST FOR SECURITY COUNSEL TO PLACE INMATE ON EXTENDED LOCKDOWN.

(2) ADMINISTRATIVE DETENTION: C.C.C. ISOLATION, O.P.P. TIER C–1, H.O.D. 9th FLOOR. THE AMOUNT OF TIME AN INMATE IS SENTENCED TO THE ABOVE RE-

ADJUSTMENT AREAS WILL BE DETERMINED BY THE DISCIPLINARY BOARD. NO INMATE WILL RECEIVE MORE THAN THIRTY (30) DAYS FOR ANY ONE (1) VIOLATION OF THE RULES AND REGULATIONS OF THE INMATE'S GUIDELINES. ANY INMATE RECEIVING FIFTEEN (15) DAYS OR MORE WHO IS HOUSED AT THE C.C.C. WILL BE RETURNED TO O.P.P. AND PLACED ON TIER C–1.

(3) DISCIPLINARY SEGREGATION, LOSS OF VISITING PRIVILEGES.

(4) WITHHOLDING OF GOOD TIME.

(5) REMOVAL FROM WORK DETAILS OR PROGRAMS.

(6) EXTRA WORK DETAILS

(7) REPRIMAND, PROBATION OR WARNING, SPECIFIC TIME INDICATED.

(8) CRIMINAL CHARGE, WHEN APPLICABLE.

(9) NO ACTION TAKEN, OR NECESSARY ACTION TAKEN, RETURN TO TIER.

THE DISCIPLINARY BOARD WILL TAKE INTO CONSIDERATION ALL ASPECTS OF THE INMATE'S RIGHTS DURING THE HEARING. NO INMATE WILL BE BROUGHT BEFORE THE BOARD WITHOUT AN INCIDENT REPORT OR THE RESULTS OF A COMPLETED INVESTIGATION, THE DISCIPLINARY BOARD IS VESTED WITH A WIDE RANGE OF LATITUDE AND DISCRETION TO BE USED IN A TOTAL OBJECTIVE MANNER DURING ANY BOARD HEARING. INMATES WHO RECEIVE ANY TYPE OF DISCIPLINE AS A RESULT OF THE HEARING, MAY APPEAL THE SENTENCE TO THE WARDEN, OR CHIEF OF SECURITY. THIS ACTION MUST BE IN WRITING AND SUBMITTED WITHIN SEVENTY–TWO (72) HOURS OF THE BOARD'S HEARING. A UNIFORM APPLICATION FOR APPEAL HEARING MUST BE LEGIBLY WRITTEN BY THE PETITIONER. APPEALS NOT IN PROPER FORM WILL BE RETURNED TO PETITIONER.

## DISCIPLINARY DEFINITIONS

ADMINISTRATIVE DETENTION: A HOLDING AREA, PREFERABLY A RE–ADJUSTMENT AREA WERE PRISONERS WHO PRESENT A IMMEDIATE THREAT TO THE SECURITY OF THE FACILITY THROUGH SPECIFIC ACT OF PLANNED OR COMMITTED MISBEHAVIOR OF RULES AND REGULATIONS OF THE INSTITUTION.

DISCIPLINARY SEGREGATION: LOSS OF VISITATION PRIVILEDGES (THE AMOUNT OF VISITATION PRIVILEDGES IS DETERMINE BY THE DISCIPLINARY BOARD).

REPRIMAND: PROBATION OR WARNING, SPECIFIC TIME OF, PROBATION IS INDICATED ON THE INCIDENT REPORT. PRISONER SHALL RETURN TO HIS/HER ASSIGN TIER.

CAUTIONED: NO ACTION TAKEN OR NECESSARY ACTION TAKEN UPON BEING COUNSELED BY DISCIPLINARY BOARD MEMBERS. PRISONER SHALL RETURN TO HIS/HER ASSIGN TIER.

EXTENDED LOCK–DOWN: MAXIMUM SECURITY AREA FOR CONFINING PRISONERS WHO HAVE BEEN FOUND GUILTY OF SERIOUS MISBEHAVIOR OR WHO MAY CAUSE DANGER TO HIMSELF OR CAUSE GREAT BODILY HARM TO ANOTHER PERSON. A PRISONER CAN BE PLACED IN EXTENDED LOCK–DOWN BY CLASSIFICATION DIVISION OR IF REQUESTED BY S.I.D. UNTIL HE CAN BE REVIEWED BY THE SECURITY COUNSEL BOARD FOR LESSER CUSTODY STATUS. A PRISONER CAN ALSO BE PLACED ON EXTENDED LOCK–DOWN IF THEY VIOLATE ONE OR MORE SERIOUS RULE OF THE INSTITUTION. PRISONERS ASSIGNED TO EXTENDED LOCK–DOWN ARE CLASSIFIED AS A SECURITY RISK CLASS ONE (1) INMATE. THIS MERLY MEANS THAT DOCUMENTED INFORMATION REVEALS

THAT THIS INMATE POSE A THREAT TO THE SECURITY AND ORDERLY RUNING OF THE INSTITUTION. PRISONERS IN EXTENDED LOCK–DOWN WILL BE REVIEWED BY A SECURITY COUNSEL BOARD FOR POSSIBLE RELEASE TO A LESSER CUSTODY STATUS, AT LEAST EVERY SIXTY (60) DAYS.

DISCIPLINARY BOARD: IS A IMPARTIAL TRIBUNAL CONSISTING OF AT LEAST THREE (3) MEMBERS OF THE ORLEANS PARISH CRIMINAL SHERIFF'S OFFICE, THE DISCIPLINARY BOARDS DUTY IS TO PROVIDE FAIR AND IMPARTIAL HEARING FOR PRISONERS ACCUSED OF VIOLATION OF RULES AND REGULATIONS OF THE INSTITUTION.

APPEALS: PRISONERS MAY APPEAL THE DISCIPLINARY BOARDS DECISION IF HE/SHE IS DISSATIFIED WITH THE HANDLING OF HIS/HER CASE AT THE DISCIPLINARY HEARING YOU MUST FILL OUT A APPLICATION FOR APPEAL HEARING FORM. *THIS PETITION MUST BE LIGIBLY WRITTEN AND SUBMITTED TO THE WARDEN OF THE INSTITUTION WITHIN SEVENTY–TWO (72) HOURS AFTER SENTENCING FROM THE DISCIPLINARY BOARD.* IF PETITIONERS APPEAL IS NOT IN PROPER FORM, IT WILL BE RETURNED TO PETITIONER TO BE FILLED OUT CORRECTLY. THE APPEAL BOARD MAY SUSPEND THE DISCIPLINARY BOARDS SENTENCE PENDING A APPEAL, IF SO DESIRED.

WITHHOLDING OF GOOD TIME: SPECIFIC NUMBER OF DAYS INDICATED. IF NECESSARY A DEPARTMENT OF CORRECTION INMATES WHO ARE AWAITING TRANSPORTATION TO D.O.C. AND HAS VIOLATED MANY RULES AND REGULATIONS OF THE PARISH PRISON SYSTEM, A DISCIPLINARY RECORD WILL BE FORWARDED TO BATON ROUGE RECORD ROOM REQUESTING WITHHOLDING OF YOUR GOOD TIME. SPECIFIC NUMBER OF DAYS WILL BE INDICATED DEPENDING ON THE SERIOUSNESS OF THE VIOLATION.

CRIMINAL CHARGES WHEN APPLICABLE: IN ADDITION TO BEING PUNISHED BY FACILITY AUTHORITIES FOR VIOLATION OF PRISON RULES AND REGULATIONS, PRISONERS MAY ALSO BE PROSECUTED IN DISTRICT COURT FOR CRIMINAL CONDUCT. STATE AND FEDERAL LAWS APPLY TO ALL PRISONERS.

INCIDENT REPORT: A REPORT ON THE APPROVED FORM FILED BY AN EMPLOYEE WHO HAS REASON TO BELIEVE OF HIS OWN KNOWLEDGE THAT A PRISONER/S HAS VIOLATED ONE OR MORE DISCIPLINARY RULE. THIS REPORT CAN ALSO BE FILED WITH THE SOURCES OTHER THAN THE REPORTING EMPLOYEE'S FIRST HAND KNOWLEDGE, SOURCES SUCH AS CONFIDENTIAL INFORMANTS, OTHER PRISONERS, NON–EMPLOYEES. INCIDENT REPORTS ARE REVIEWED AND HEARD BY THE DISCIPLINARY BOARD. A RECORD OF THE PRISONERS DISCIPLINARY REPORTS IS KEPT IN THE INMATES FILE TO LATER DETERMINE GOOD TIME STATUS.

INVESTIGATION REPORT: A REPORT SUBMITTED FOR APPROPRIATE DISPOSITION TO THE DISCIPLINARY BOARD BY A INVESTIGATIVE OFFICER DETAILING THE FACTS THAT IS UNCOVERED IN A INVESTIGATION.

INVESTIGATIVE OFFICER: AN EXPERIENCED AND TRAINED EMPLOYEE ASSIGNED BY THE DISCIPLINARY BOARD OR BY A RANKING EMPLOYEE TO INVESTIGATE A DISCIPLINARY REPORT, INCIDENT REPORT, OR ANY MATTER FELT TO BE WORTHY OF INVESTIGATION. A INTER–OFFICE CORRESPONDENCE REPORT WILL BE DOCUMENTED BY THE INVESTIGATING OFFICER/S TO DETERMINE A DISPOSITION FOR THE DISCIPLINARY BOARD.

POSTED POLICY: AS USED HEREIN, APPLIES TO POLICY MEMORANDUMS

DETAILING WHAT BEHAVIOR IS RE-QUIRED OR FORBIDDEN REGARDING THE INDIVIDUAL NEEDS OF THE FA-CILITY.

ISOLATION: A HOLDING AREA, PREF-ERABLY A CELL TO SEGREGATE IN-MATES FROM THE GENERAL POPULA-TION FOR THEIR OWN PROTECTION.

SECURITY COUNSEL BOARD: A GROUP OF HIGHLY TRAINED INDI-VIDUALES WHO HAVE BEEN CLASSI-FIED AS EXPERT WITNESSES IN THE FIELD OF SECURITY IN JAIL INSTI-TUTION, WHO HAS THE AUTHORITY TO MAKE CHANGES ON WHAT BE-HAVIOR IS REQUIRED OR FORBIDDEN REGARDING THE INDIVIDUAL NEEDS OF ALL JAIL FACILITIES OPERATED BY THE ORLEANS PARISH SHERIFF'S OFFICE.

### ORLEANS PARISH PRISON RULES AND REGULATIONS

### NOTICE TO INMATE OF INSTITUTION RULES

Staff shall advise each inmate in writing at the time of arrival at an institution of:

(a) The types of disciplinary action which may be taken by institution staff;

(b) The disciplinary system within the institution (See Table 1);

(c) The inmate's rights and responsibilities; and

(d) Prohibited acts, by inmates and code number, which are:

001 Killing.

002 Assaulting any person.

003 Fighting with another person.

004 Threatening another with bodily harm, or with any offense against his person or property.

005 Extortion, blackmail, protection: Demanding or receiving money or anything of value in return for protection against others, to avoid bodily harm, or under threat of informing.

051 Engaging in sexual acts with others.

052 Making sexual proposals or threats to another.

053 Indecent exposure.

101 Escape.

102 Attempting or planning escape.

103 Wearing a disguise or mask.

151 Setting a fire.

152 Destroying, altering or damaging government property or the property of another person.

153 Stealing (theft).

154 Tampering with or blocking any locking device.

155 Adulteration of any food or drink.

201 Possession or introduction of an explosive or any ammunition.

202 Possession or introduction of a gun, firearm, weapon, sharpened instrument, knife, or unauthorized tool.

203 Possession, introduction, or use of any narcotics, narcotic paraphernalia, drugs, or intoxicants not prescribed for the individual by the medical staff.

204 Misuse of authorized medication.

205 Possession of money currency, unless specifically authorized.

206 Possession of property belonging to another person.

207 Loaning of property or anything of value for profit or increased return.

208 Possession of anything not authorized for retention or receipt by the inmate, and not issued to him through regular institutional channels.

209 Possessing any officer's or staff clothing.

210 Possessing unauthorized clothing.

211 Mutilating or altering clothing issued by the government.

251 Rioting.

252 Encouraging others to riot.

253 Engaging in or encouraging a group demonstration.

254 Refusing to work, or to accept a program assignment.

255 Encouraging others to refuse to work or participate in work stoppage.

256 Refusing to obey an order of any staff member.

257 Violating a condition of furlough.

258 Violating a condition of work or study release.

259 Refusing to provide a urine sample, breathalyzer test, or other drug or alcohol abuse test.

301 Unexcused absence from work, or any assignment.

302 Malingering, feigning an illness.

303 Failing to perform work as instructed by a supervisor.

304 Insolence towards a staff member.

305 Lying or providing a false statement to a staff member.

306 Conduct which disrupts or interferes with the security or orderly running of the institution.

351 Counterfeiting, forging, or unauthorized reproduction of any document, article of identification, money, security, or official paper.

401 Participating in an unauthorized meeting or gathering.

402 Being in an unauthorized area.

451 Failure to follow safety or sanitation regulations.

452 Using any equipment or machinery which is not specifically authorized.

453 Using any equipment or machinery contrary to instructions or posted safety standards.

501 Failing to stand count.

502 Interfering with the taking of count.

551 Making intoxicants.

552 Being intoxicated.

553 Smoking where prohibited.

554 Using abusive or obscene language.

601 Gambling.

602 Preparing or conducting a gambling pool.

603 Possession of gambling paraphernalia.

651 Being unsanitary or untidy: failing to keep one's person and one's quarters in accordance with posted standards.

652 Tattooing or self-mutilation.

701 Unauthorized use of mail or telephone.

702 Unauthorized contacts with the public.

703 Correspondence or conduct with a visitor in violation of posted regulations.

704 Conducting a business.

751 Giving or offering an official or staff member a bribe or anything of value.

752 Giving money or anything of value or accepting money or anything of value from another inmate, a member of his family, or his friend.

753 Giving money to or receiving money from any person for purposes of introducing contraband or for any other illegal or prohibited purpose.

801 Attempting to commit any of the above offenses, aiding another person to commit any of the above offenses and making plans to commit any of the above offenses shall be considered the same as a commission of the offense itself.

802 Clotheslines will not be allowed on any tier without permission of the Sheriff.

803 Electrical extension cords will not be allowed on any tier.

804 Pictures, photographs, or any such article (with the exception of memos from the Sheriff's Office and athletic schedules) will not be glued, pasted or affixed to walls.

805 No inmate will be allowed to retain medication prescribed by the staff of the Prison Hospital any longer than one day.

806 No inmate will be allowed in the vestibule area without the permission of the tier Deputy.

807 All tiers will be swept and mopped daily. It will be the Tier Represent-

ative's duty to see that the tier is maintained in a clean and sanitary manner.

808 All broken brooms and mops (or any other clean-up tool) will be turned into the tier deputy immediately.

809 Inmates will address Deputies as "Captain" or "Deputy", they will address members of the Sheriff's Staff by their proper title.

810 Inmates will be served chow on a "first come, first serve" basis.

811 Lighting fixtures will not be tampered with, covered up, or altered in anyway.

812 No food will be kept on the tier after chow.

813 Weapons of any type will not be allowed on the tier.

814 Yelling or shouting out of windows will not be allowed.

815 Inmates will not be allowed to take combs, belts or hats while making court appearances.

816 Any breach of the inmate rules and procedures will result in a violation report on the inmate, or if necessary, the entire tier.

817 *Medicla care is available to all inmates on a 24-hour basis. Paramedical personnel tour the tiers four times daily. If you have a problem, let a paramedic know.*

818 No inmate will be allowed to have a private radio or television.

819 All property taken from you during the booking procedure must be picked up from Orleans Parish Prison within 7 days after booking. It will be discarded if it is not picked up. During the booking procedure you will designate the individual who is to pick up your property.

820 Any personal property, clothing, etc., which will not fit into your property box on the tier, will be removed from the tier.

821 You will not be allowed to possess another inmate's medication.

822 You must stay fully clothed during the day until retiring for sleep.

823 Subject to being charged for violations of City Ordinances, State laws or Federal Statutes while in custody.

824 Disciplinary action taken in the prison regarding violation of Ordinances, state law or Federal Statutes does not rule out your being prosecuted for these violations.

825 Haircuts—the wearing of beards and goatees by male inmates is, hereby prohibited. Hair shall be neat, clean, trimmed, and shall present a groomed appearance. Bush style hair cuts may not protude out from the scalp more than 2 inches. Side burns shall be neatly trimmed and extend to the lowest part of the ear lobe. Wigs or hair pieces shall not be worn. Mustaches may be worn provided that they are neatly trimmed. The Orleans Parish Criminal Sheriff's Office *will provide a full-time barber, free-of-charge, to service all inmates.*

826 Plaits will not be worn in the hair between the hours of *6 AM and 8 PM.* Violators are subject to disciplinary action.

827 Head Bands on covering of the head will not be allowed between 6 AM and 8 PM.